# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Brent Samples, et al.,

   Plaintiffs,

              Case No. C2-03-847

  v.           Judge Smith

              Magistrate Judge Abel

Logan County, Ohio, et al.,

   Defendants.

## OPINION AND ORDER

Plaintiff Brent Samples, as the administrator of Susan Samples' estate, and their two children, bring the present action against defendants Logan County, Ohio, and nine Logan County employees. Specifically, plaintiffs assert a claim under 42 U.S.C. § 1983 alleging defendants violated Susan Samples' constitutional rights under the Eighth and Fourteenth Amendments. Plaintiffs also assert state law claims for negligence and wrongful death. Defendants move for summary judgment on all claims (Doc. 47).[1] For the following reasons, the Court GRANTS in part and DENIES in part defendants' motion.

## I. FACTS

### A. Ms. Samples' Arrest & Court Appearance

During the early morning hours of September 17, 2002, plaintiff Brent Samples called the Logan County Sheriff for assistance. Brent's wife, Susan Samples, was intoxicated at the time and was keeping their children awake on a school night. Her behavior was also keeping Mr. Samples awake, who had to go to work later that morning. Brent Samples feared that his wife, in

---

[1] The Court grants defendants' motion (Doc. 45) for leave to file excess pages in support of their summary judgment motion. Likewise, the Court grants plaintiffs' motion (Doc. 49) for leave to file excess pages in opposition to defendants' summary judgment motion.

her intoxicated state, would hurt herself or their children.  Defendant Sergeant Frank Galyk of the Logan County Sheriff's Office responded to the call and arrived at the Samples' home at approximately 2:30 a.m.  Upon arrival, Sgt. Galyk spoke to Ms. Samples and noticed several signs of intoxication.  During this conversation, Ms. Samples accused her husband of hitting her after she attempted to wake him.  Mr. Samples denied hitting her and Ms. Samples began yelling at him in response.

Sgt. Galyk told Ms. Samples to stay calm while he sorted the matter out.  He then spoke to Mr. Samples who told him that Susan was an alcoholic and he was concerned for her well being.  After Susan continued her disruptive behavior notwithstanding Sgt. Galyk's warnings, Sgt. Galyk arrested her for persistent disorderly conduct.  He then transported Ms. Samples to the Logan County Jail, arriving between 3:15 and 3:30 a.m.

Upon arrival at the jail, Sgt. Galyk completed a Jail Commitment Form.  This document is a record of the exchange of custody of an arrestee from the arresting officer to the County Jail.  On this form, Galyk originally marked that Ms. Samples was intoxicated, but this was crossed off at a later time.  (Pl. Dep. Ex. 8).  Galyk has no knowledge of who altered the document.

At a later time, Sgt. Galyk completed an Offense Report for Ms. Samples.  In it, Galyk explained how Brent Samples told him that Ms. Samples drinks constantly and needs help for her alcoholism.  (Pl. Dep. Ex. 31).  Neither the offense report nor the specific facts it contained dealing with Ms. Samples' history of alcoholism were shared with anyone at the County Jail.

Because Ms. Samples was intoxicated at the time she arrived at the jail, she was placed in

2

a holding cell to sleep off the effects of the alcohol.[2]  At approximately 6 a.m., defendant Chuck

Wirick, a correction officer, processed Ms. Samples into the jail.  Also on duty at this time were

defendants Correction Officer Heather Boone and Corporal Guy Knight.  Pursuant to jail policy,

Wirick completed a Medical Screening Form and indicated on it that Ms. Samples was visibly

under the influence of alcohol.  (Pl. Dep. Ex. 38).  This was based on Wirick's own observation

of Ms. Samples.  The medical screening form also contained a list of approximately thirty

medical questions to ask an inmate.  However, none of the questions dealt with the length of time

Ms. Samples had been drinking or any other question related to her history of alcohol use or

alcohol withdrawal.  Under the jail's policy in place at that time, booking officers would find out

about an inmate's history of alcohol abuse or alcohol withdrawal only if the inmate volunteered

the information.  If an inmate volunteered this information, the officers would take special

precautions to reduce the risk of alcohol withdrawal.  Susan Samples was never asked about her

history of alcohol abuse, nor did she volunteer the information.

      Later that morning, Susan appeared in Municipal Court and pled guilty to persistent

disorderly conduct.  The court sentenced Ms. Samples to seven days in jail.  She then returned to

the Logan County Jail that day to serve her sentence.  Jail administrators assigned her to a top

bunk in E Block, a general population area of the jail.

      At approximately 7 p.m. that day, Mr. Samples and the two children visited Ms. Samples

at the jail.  Susan still appeared to be upset with her husband for what happened.  Susan spoke to

---

[2] When an arrestee enters the Logan County Jail, several steps are involved to process the new inmate into
the jail.  This includes exchanges of personal clothing and items for jail-issued clothing, fingerprinting, photo-
identification, as well as a medical screening conducted by an intake correction officer.  If an inmate is too
intoxicated to participate meaningfully in this booking process, the booking officer gives the inmate time to sober
up.

her children, and Mr. Samples observed that she did not look well at the time.  This was the last time Mr. Samples saw his wife before her death.

**B.  Ms. Samples' Contact with Jail Personnel and Other Inmates**

Throughout her short time in jail, Ms. Samples had personal contact with several members of the jail staff.  Every hour, correction officers conduct watch tours of the jail.  These tours are done to ensure the security of the facility and to observe the general well being of the inmate population.  Watch tours allow officers to enter cells and housing blocks in order to have contact with inmates and to address questions they might have.  The tours enable the correction officers to observe the inmates and to identify any problems, including medical problems that need to be addressed.  In addition to watch tours, Lieutenant Chris Brown, the Jail Administrator in charge of the Logan County Jail, conducts supervisory walkthroughs of the jail.  This allows him to tour the housing blocks at least once per day.

After an officer conducts the hourly tour and checks on the inmates, he or she then records completion of the watch tour by pressing a button in each housing block.  Each button is connected to a computer in central control, indicating that the tour was conducted in the applicable housing unit.

At about midday on September 17, 2002, Lt. Brown conducted one of his supervisory walkthroughs.  Ms. Samples stopped him in E Block.  Ms. Samples was sitting on her bed at the time, and she asked Lt. Brown how she could obtain some personal hygiene items.  He explained to her that such items would be distributed in the morning.  Lt. Brown remembers that Ms. Samples appeared well.  Specifically, he states that she appeared to have "her faculties about her, and she spoke to me intelligently."  (Ex. A, ¶ 9, Def. Mot. S.J.).  She did not indicate to Lt.

4

Brown that she had any problem with being assigned to a top bunk, and she did not ask for any medical attention.  Lt. Brown did not discern any need for medical attention for Ms. Samples, nor did he find any requests in her medical file or in her inmate file to see a nurse or doctor.

Furthermore, Cpl. Knight conducted a watch tour at some point before Ms. Samples' accident.  During this tour, Cpl. Knight walked through the housing block and checked on the inmates.  He checked to make sure that someone was in every bed in which there was supposed to be an inmate.  During this time, he did not hear any sounds coming from Ms. Samples.  Also, none of the other inmates in the area reported any problems to Knight, specifically in regards to Ms. Samples.  He discerned that no inmates  required special attention at the time, including medical care.

Defendant Marla Stockton, another correction officer, conducted the watch tour for E Block during the 5 a.m. hour on September 18, 2002.  She walked through the housing block shortly after 5 a.m.  Stockton recalled the specifics of this walkthrough because a female inmate had asked her for the time, anticipating being released at 5:30 a.m. that morning.  During the walkthrough, besides the inmate that had asked for the time, Stockton heard no sounds from any other inmates.  She established "sight and sound" observation of all inmates in the cell block and saw no inmates in any sign of distress.  (Stockton Dep. at 47).  She heard no unusual breathing sounds coming from Ms. Samples, nor was she told by any other inmate of any irregular breathing sounds.  Computer-generated logs show that the watch tour for the 5 a.m. hour was completed in E Block at 5:16:56 a.m., as evidenced by the pressing of the watch tour button at that time.  (Ex. A, ¶ 33, Def. Mot. S.J.).

Besides her contact with members of the jail staff, Susan Samples also had contact with

the ten other inmates in her cell block.  Several of them have provided their observations of Susan the night she was in jail.[3]  One inmate noticed that Susan was shaking badly before she went to sleep that night, while another noticed that Susan was tossing and turning all night.  A third inmate reports that Susan was pale and shaky, and that she did not look good.  Furthermore, several inmates noticed that Susan tossed and turned all night, and that she was making unusual breathing sounds.  These sounds, according to various inmates, resembled "big long deep breaths with a gurgling sound;" "breathing funny like something [was] stuck in her throat;" "like she was drowning;" "snorted breathing;" "gargling noise."  (Ex. 2, Pl. Mem. Opp.).  Susan's breathing awoke Rhonda Herford, the inmate assigned to the bed below Susan's.  However, none of the inmates reported any concerns to a member of the jail staff.

## C.  Ms. Samples' Accident and Death

Around 5:30 a.m., inmates in E Block realized that Ms. Samples had fallen out of her top bunk.  Susan had fallen out of bed after having some sort of seizure.  They called central control via an intercom located in the housing block.  Cpl. Knight was in central control and took that call.  Computer-generated logs show that the first call from the E Block intercom was at 5:35:48 a.m.  Cpl. Knight stood to look from his chair in the control center into the housing block.  He saw a group huddled around someone or something.

Cpl. Knight then called on the radio to the correction officers on duty to report to E Block regarding an inmate who had fallen out of bed.  The four correction officers on duty at the time

---

[3] Many of these observations are summarized in the coroner's investigation, which included interviews of each of the ten inmates in Cell Block E.  (See Ex. 2, Pl. Mem. Opp.).  Also, two inmates, Jennifer Burton and Amber Mattox, have provided sworn affidavits describing their observations of Susan Samples before her accident.  (See Ex. B, C, Def. Mot. S.J.).

were Officers Wirick, Boone, Stockton and Amy Oakley, another defendant in this case.

Inmates then called again to report that the injuries involved bleeding.  Cpl. Knight conveyed

that additional information to the responding officers.

The four officers proceeded towards the housing block from the booking area.  The

officers had to travel through three locked doors, each of which had to be closed and locked

again before the next one could be opened.  From the time inmates first called for help until the

time officers arrived in E Block, one minute and eleven seconds elapsed.

Officers Wirick and Boone were the first to enter the cell block.  They assessed Ms.

Samples by checking for a pulse and for breathing.  Ms. Samples was lying face down on the

floor next to her bunk.  Officer Boone reported that she thought Susan had a faint pulse.  She did

not think it was a "healthy" pulse.  (Boone Dep. at 88).  Officer Wirick also checked for a pulse,

but was unable to determine whether or not Susan had one.  Officer Wirick gently shook Susan

to determine whether or not she was conscious.  Ms. Samples grunted in response and moved her

arm at Wirick as if to push him away.  Officer Wirick observed that Susan was breathing at the

time, noting that she was inhaling and exhaling.  There was a lot of blood on the ground

underneath Ms. Samples head.  As a result, the officers concluded that she may have endured a

head or neck injury, and thus chose not to move her.

Officer Boone also observed Susan breathing.  She saw that Susan's back was moving up

and down and observed "low, deep, shallow breathing."  (Boone Dep. at 89).  At some point

before the squad arrived, Officer Boone noticed that Susan's breathing had turned into a gurgling

sound.  Officer Boone concluded that Susan was probably not breathing at that point.  From the

time Officers Wirick and Boone first arrived in the cell block until the paramedics arrived,

neither officer administered to Ms. Samples mouth-to-mouth resuscitation or CPR.  Dr. Rodrick Gottula, plaintiffs' expert, testified that this delay in administering CPR was well below the applicable standard of care.

Officer Wirick used his radio to inform Cpl. Knight that an ambulance was needed for the fallen inmate.  Cpl. Knight then called the jail nurse at home to inform her of the situation, hung up and then called for the emergency squad.  He estimated that the call to the nurse lasted five seconds.  After he had called the squad, Officer Wirick called Cpl. Knight on the radio for a second time, explaining that the squad needed to hurry.  Cpl. Knight called the squad again and conveyed Wirick's request.

The other two officers on duty at the time, Officers Stockton and Oakley, were the second pair of officers to enter the cell block.  After entering, they observed that the other female inmates were visibly upset.  In response, the two officers escorted the women to an upper level of the cell block.  This was done to secure the housing unit and to ensure that no one would hinder the paramedics once the squad arrived.  At some point, Cpl. Knight ordered Officer Stockton to report to the booking area to wait for the emergency squad.

Cpl. Knight had himself replaced at central control by Officer Boone.  Cpl. Knight left the control center and waited for the squad to arrive.  Officer Wirick remained in the cell block with Ms. Samples.  Cpl. Knight and Officer Stockton helped the squad members into the jail, holding doors open so that the equipment could get through doors quickly.

After the paramedics entered the housing block, they assessed Ms. Samples and determined she was in full code.  She did not have a pulse and she was not breathing.  The paramedics then called for backup so that a defibrillator could be brought inside the housing

8

block. Ms. Samples was eventually transported to the local hospital's emergency room. She was declared dead at the hospital at approximately 7 a.m. on September 18, 2002. A subsequent coroner autopsy and investigation revealed that Ms. Samples died of acute alcohol withdrawal.

## II. ANALYSIS

### A. Federal Claims

#### 1. Individual Defendants

The treatment of prisoners and the conditions under which they are confined are subject to scrutiny under the Eighth Amendment. Helling v. McKinney, 509 U.S. 25, 31 (1993). A prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment. Farmer v. Brennan, 511 U.S. 825, 828 (1994). Moreover, when prison officials act with deliberate indifference to an inmate's serious medical needs so that they inflict unnecessary pain or suffering, their actions violate the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976); Horn v. Madison County Fiscal Court, 22 F.3d 653, 660 (6th Cir. 1994).

The standard for whether or not a prison official acted with deliberate indifference is a subjective one. The Supreme Court articulated this standard in Farmer:

> We reject petitioner's invitation to adopt an objective test for deliberate indifference. We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer, 511 U.S. at 837. This standard requires a prison official to consciously disregard an inmate's substantial risk of serious harm. Bradley v. City of Ferndale, 2005 WL 2173780, *5 (6th Cir. Sep. 8, 2005). On the other hand, when an official fails to act in the face of an obvious

risk of which he should have known but did not, the official has not acted with deliberate indifference.  See Farmer, 511 U.S. at 837-38.  Finally, whether a prison official had knowledge of a substantial risk is a question of fact that may be demonstrated through circumstantial evidence.  Id. at 842.  The factfinder may conclude that the official knew of the risk simply from the fact that the risk was obvious.  Id.

Plaintiffs fail to address the issue of deliberate indifference with regard to Sgt. Galyk as the arresting officer.  Plaintiffs also fail to address this issue with regard to the booking officers, namely, Officers Wirick, Boone, and Cpl. Knight.  Accordingly, plaintiffs' federal claim against these parties in their aforementioned capacities is abandoned.

Plaintiffs do assert that the responding officers, namely, Officers Wirick, Boone, Stockton, Oakley, and Cpl. Knight, were deliberately indifferent to the serious medical needs of Susan Samples after she fell out of her bunk.  Defendants disagree.

As discussed above, because Officers Wirick and Boone attended to Ms. Samples after her fall, Officers Stockton and Oakley attended to other inmates who were visibly upset over Susan's accident.  Officer Oakley escorted these inmates to the upper level of the housing block, and Officer Stockton assisted.  This was done in order to secure the unit and to remove inmates who could have been in the way once the paramedics arrived.  At some point, Cpl. Knight ordered Stockton to report to the booking area to contact the Jail Administrator and Assistant Administrator.  She was also ordered to wait for the emergency squad.  When the paramedics arrived, she assisted in escorting them to E Block.  Finally, when Officer Stockton arrived back in the housing unit, she assisted an inmate who had begun hyperventilating.

The Court finds that plaintiff has failed to adduce sufficient evidence of deliberate

indifference by defendants Marla Stockton and Amy Oakley.  When faced with a medical emergency, both officers reacted reasonably.  See Farmer, 511 U.S. at 844 (officials who know of a substantial risk to inmate health or safety are free from liability if "they responded reasonably to the risk, even if the harm ultimately was not averted.").  Because other officers were attending to Ms. Samples directly, Officers Stockton and Oakley did their part in securing the rest of the housing unit and assisting the paramedics in gaining access to the housing unit.  Plaintiffs assert deliberate indifference, but fail to specify what more the officers should have done.  The Eighth Amendment claim against these defendants in their individual capacities fails as a matter of law.

The Court also finds that plaintiffs have failed to adduce sufficient evidence of defendant Guy Knight acting deliberately indifferent to Ms. Samples' medical needs.  When Cpl. Knight received the call that an inmate had fallen out of her bunk, he ordered four correction officers to respond.  He called for an emergency squad twice, once as an initial call and the second time to relay the seriousness of the accident.  Cpl. Knight then had himself replaced at central control and assisted the paramedics in gaining access to Ms. Samples' housing block.  When faced with a medical emergency, Cpl. Knight acted appropriately.  Plaintiffs fail to specify what more Cpl. Knight should have done.  The Eighth Amendment claim against him in his individual capacity fails as a matter of law.

As for Officer Wirick, the Court finds plaintiffs have adduced sufficient evidence of deliberate indifference to overcome summary judgment.  In his defense, defendants point out that Officer Wirick took several steps to assist Ms. Samples after her fall.  This included checking her vital signs; asking her if she was alright; noting that she had a possible head injury; noting that

11

she grunted and moved her arm upon initial contact; noting that she was breathing at least initially; and calling twice for an emergency squad.  However, at some point between the time when the officers first arrived to assist Ms. Samples and the time the paramedics arrived, Susan stopped breathing.  This is evidenced by the fact that she was in full code and not breathing when the paramedics arrived, as well as by Officer Boone's statement that she believed Susan had stopped breathing.  When a person has no pulse or has stopped breathing, administering CPR is the appropriate course of action.  (Costin Dep. at 63; Shively Dep. at 66-67).  A reasonable jury could find that, based on Susan's condition when the paramedics arrived, as well as Officer Boone's observations of Susan, Officer Wirick knew that Susan had a serious medical need and consciously disregarded it by failing to administer CPR.

The same conclusion can be reached with regard to Officer Boone.  She originally thought Susan had a faint but unhealthy pulse.  She stated that she believed Ms. Samples had stopped breathing at some point before she left for central control.  Ms. Samples' breathing, according to Officer Boone, resembled a gurgling sound at one point.  However, Officer Boone failed to communicate this fact to anyone until she was back in central control.  Also, just like Officer Wirick, Officer Boone never administered CPR to Susan.  Therefore, the Court finds genuine issues of material fact exist as to whether Officer Boone consciously disregarded a substantial risk of serious harm to Ms. Samples.

Regarding defendant Michael Henry, the County Sheriff, defendant Scott Costin, the Jail Physician, and defendant Brenda Shively, the Jail Nurse, defendants contend that none of these officials had any personal contact with Ms. Samples and therefore cannot be held individually

12

liable for an alleged violation of her civil rights.[4]  Plaintiffs assert that the relevant inquiry is whether these three defendants knew that the jail's screening policy created a substantial risk of harm to alcoholic inmates generally, rather than the risk of harm to Ms. Samples specifically.

Plaintiffs primarily rely on two cases to show deliberate indifference.  First, in <u>Taylor v. Michigan Dept. of Corrections</u>, 69 F.3d 76 (6th Cir. 1996), a prison inmate who was raped after being transferred to another facility brought a section 1983 action against the prison warden. The Court summarized the claim as follows:

> In the instant case [defendant] Foltz is charged with abandoning the specific duties of his position–adopting and implementing an operating procedure that would require a review of the inmate's files before authorizing the transfers–in the face of actual knowledge of a breakdown in the proper workings of the department.

<u>Id.</u> at 81.  In response to the warden's argument that he had no knowledge of the plaintiff's particular vulnerabilities to sexual assault, the Court stated, "<u>Farmer</u> makes it clear that the correct inquiry is whether [defendant] had knowledge about the substantial risk of serious harm to a particular class of persons, not whether he knew who the particular victim turned out to be." <u>Id.</u>  In the end, because the warden knew that small, youthful prisoners are especially vulnerable to sexual assault, and because he knew that his subordinates were neglecting to review prison files before authorizing inmate transfers, the Court held that a reasonable jury could find that the warden was deliberately indifferent to the plaintiff inmate's well being.  In essence, there was adequate evidence to show that the warden knew about the substantial risk of serious harm the

---

[4] It is undisputed that these three defendants had no personal contact with Susan Samples.

prison's transfer policy caused for a particular class of inmates which included the plaintiff.[5]

Second, plaintiffs cite to Crutcher v. Edwards, No. 2:01-cv-1159 (S.D. Ohio Sep. 30, 2002). The plaintiff in this unreported case was an inmate who sued a prison warden after being assaulted by another inmate. Relying on the principles from Taylor, the district court found that the plaintiff had demonstrated genuine issues of material fact as to the warden's deliberate indifference. The court explained that a prison official need not know the details of a specific risk of harm to an inmate. Rather, the official must know of a substantial risk of harm to a class of inmates to which the plaintiff belonged.

Applying this framework to the present case, the Court finds plaintiffs have failed to support their claim of deliberate indifference on the part of defendants Henry, Costin, and Shively. Plaintiffs have provided no evidence that any of the three individuals knew that the jail's screening policy created a substantial risk of harm to alcoholics. Plaintiffs focus on the fact that the defendants were aware of the general dangers of alcohol withdrawal and were aware of the prison's screening policy. This however, does not establish the requisite knowledge. Unlike in Taylor and Hill, plaintiffs have provided no evidence that the three defendants knew of and disregarded any problems with the jail's policy. Nor have plaintiffs provided evidence that the defendants failed to perform their duties in the face of an actual breakdown in jail policy. To the contrary, defendants believed that the jail's screening policy, coupled with the jail's other layers of protection for inmate health and safety, was an adequate system. Defendants were not "aware of an obvious, substantial risk to inmate safety...." See Farmer, 511 U.S. at 843. Thus,

---

[5]See also, Hill v. Marshall, 962 F.2d 1209 (6th Cir. 1992), cert. denied, 509 U.S. 903 (1993) (Deputy Superintendent of Treatment violated inmate's Eighth Amendment rights by abandoning the specific duties of his position in the face of actual knowledge of a breakdown in the proper workings of his department).

no genuine issues of material fact exist as to deliberate indifference on the part of defendants Henry, Costin, and Shively.

### 2.  Qualified Immunity

Defendants assert in the alternative that the individual defendants are entitled to qualified immunity.  Plaintiffs contend qualified immunity does not protect Officers Wirick and Boone from liability.

Under the doctrine of qualified immunity, government officials performing discretionary functions are immune from suit unless the plaintiff shows the official violated "'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Conn v. Gabbert, 525 U.S. 286, 290 (1999) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "The central purpose of affording public officials qualified immunity from suit is to protect them 'from undue interference with their duties and from potentially disabling threats of liability.'"  Elder v. Holloway, 510 U.S. 510, 514 (1994) (quoting Harlow, 457 U.S. at 806)).

The Court must apply a two-step test to determine whether qualified immunity protects a government official.  Conn, 526 U.S. at 290; Buchanan v. City of Bolivar, 99 F.3d 1352, 1358 (6th Cir. 1996).  The first step is to determine whether a violation of a clearly established constitutional right has occurred.  Conn 526 U.S. at 290; Dickerson v. McClellan, 101 F.3d 1151, 1157 (6th Cir. 1996).  If a constitutional violation is found, the second step is to determine whether an objectively reasonable public official in the circumstances would have recognized that his conduct violated the clearly established constitutional right.  Conn, 526 U.S. at 290; Buchanan, 99 F.3d at 1358; Dickerson, 101 F.3d at 1158.

To be clearly established at the time of the conduct in question, the constitutional right

must have been recognized by the U.S. Supreme Court, the United States Court of Appeals for the Sixth Circuit, this Court or other courts within the Sixth Circuit, or, in some cases, courts of other circuits.  Sheets v. Moore, 97 F.3d 164, 166 (6th Cir. 1996); Dickerson, 101 F.3d at 1158. "The contours of the right must be sufficiently clear that a reasonable person would understand that what he is doing violates that right."  Sheets, 97 F.3d at 166.  "This is not to say that an official action is protected by qualified immunity unless the very action has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.'"  Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

The Court has already held that sufficient evidence exists to show that Officers Wirick and Boone violated Ms. Samples' Eighth Amendment rights.  Furthermore, the Court has previously discussed the legal framework for deliberate indifference claims against prison officials.  Again, a prison official violates an inmate's Eighth Amendment rights if he is deliberately indifferent to the inmate's medical needs.  Deliberate indifference, as provided in Farmer, is a subjective concept that requires conscious disregard of a known risk to inmate safety.  See Farmer, 511 U.S. at 837.  This legal concept was sufficiently spelled out in numerous opinions before Susan Samples' accident and it is clearly established for qualified immunity purposes.  Therefore, the remaining inquiry is whether an objectively reasonable prison official under the circumstances would have known that the officers' conduct violated the constitution in light of this preexisting law.

Considering the circumstances, the Court finds a reasonable prison official would not recognize that the conduct in question violated Susan's Eighth Amendment rights.  The essential factor underlying this conclusion is the officers' concern over further injury to Ms. Samples'

16

head or neck if they moved her before the paramedics arrived.  Both officers testified that they were concerned that Susan may have had a head or neck injury, and they had been trained not to move a person in that situation. Without that caveat, this would be a simple case of whether a reasonable prison official would know that failing to give CPR to an inmate who has stopped breathing is a violation of that inmate's constitutional rights.  The circumstances surrounding Ms. Samples' accident, however, are not as simple.  Officers Wirick and Boone faced a dilemma over whether to move Susan and risk further head or neck injury, or leave her in place knowing that the paramedics were on the way.  A reasonable officer under the circumstances would face the same dilemma.

In the end, an objectively reasonable prison official under the circumstances, who was trained not to move a person who sustained a head or neck injury, would not likely realize that these actions were a violation of Ms. Samples' constitutional rights.  Accordingly, Officers Wirick and Boone are entitled to qualified immunity.

### 3.  County / Defendants in Official Capacities

Plaintiffs seek to hold Logan County and the individual defendants in their official capacities liable for allegedly violating Susan Samples' Eighth Amendment rights.  Specifically, plaintiffs allege that the inmate screening policy as well as the County's prison employee training program both led to constitutional violations.

Section 1983 claims against public officials in their official capacities are treated as claims against the governmental entity.  Barber v. City of Salem, 953 F.2d 232, 237 (6th Cir. 1992).  A political subdivision such as Logan County is liable under section 1983 if its official policies or customs cause constitutional violations.  Heflin v. Stewart County, 958 F.2d 709, 716

17

(6th Cir. 1992) (citing <u>Monell v. New York City Dept. of Social Services</u>, 436 U.S. 658, 690-91

(1978)).  Plaintiffs must show that County policymakers made a deliberate choice among various

alternatives and the policy chosen ultimately caused the injury.  <u>Pembaur v. City of Cincinnati</u>,

475 U.S. 469, 483 (1986).  To successfully assert a section 1983 claim on the basis of municipal

custom or policy, a plaintiff must "identify the policy, connect the policy to the [County] itself

and show that the particular injury was incurred because of the execution of that policy."  <u>Garner</u>

<u>v. Memphis Police Dep't</u>, 8 F.3d 358, 364 (6th Cir.), <u>cert. denied</u>, 510 U.S. 1177 (1994).  The

existence of Logan County's screening policy and the specific parameters of it are not in dispute.

Thus, the relevant inquiry becomes causation.

Defendants assert that, even if Ms. Samples had been kept in the holding area, her life

would not have necessarily been saved.  In other words, if at screening the booking officer had

asked Ms. Samples about her history of alcohol use, and determined that she needed to be

monitored for risk of withdrawal, there is no guarantee that she would have survived.  Plaintiffs

disagree and instead note that proper observation of Ms. Samples would have caused prison staff

to intervene in time to avoid her death.  Plaintiffs also state that the determination of what would

have happened had Susan been placed under observation is a classic contested issue of material

fact.  The Court agrees.

As a matter of law, the Court cannot say one way or another whether the outcome would

have been different had the jail's screening policy involved asking questions about alcohol

history.[6]  However, it is not unreasonable to think that, considering the symptoms Susan was

---

[6] The jail has since changed its policy to now include questions about alcohol use.  <u>But see</u> Fed. R. Evid.
407.  Plaintiff's expert, Dr. Gottula, testified that it is common practice at other prisons to ask specific questions at
intake about the risk of alcohol withdrawal.  These questions have been routinely asked since the late 1990s.
(Gottula Dep. at 53-55).

exhibiting in the night, and considering the special precautions the jail takes when an inmate has a known risk of withdrawal, placing Susan in a special observation cell could have made a difference. The Court therefore finds plaintiffs have alleged sufficient facts to establish that the accident happened because of the County's policy. Accordingly, defendants' motion is denied on this claim.

To successfully assert their claim that the County failed to adequately train its employees, plaintiffs must prove: (1) that the training program is inadequate, (2) that the inadequacy is the result of the city's deliberate indifference, and (3) that the inadequacy is closely related to or actually caused plaintiff's injury. Hill v. McIntyre, 884 F.2d 271, 275 (6th Cir. 1989) (citing City of Canton v. Harris, 489 U.S. 378 (1989)). In determining municipal liability for an inadequate training program, "the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." Harris, 489 U.S. at 390. Regarding deliberate indifference in this context, the Supreme Court stated the following in Harris:

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

Id. at 390.

The case of Russo v. City of Cincinnati, 953 F.2d 1036 (6th Cir. 1992), dealt with a similar claim as the present case. In that case, the estate of a mentally ill individual who was shot and killed by police officers brought a section 1983 claim against the city alleging in part that it failed to adequately train its police officers. The Circuit Court reversed summary judgment for the city, explaining that genuine issues of material fact existed as to whether the

19

city's training program constitutes deliberate indifference.  In examining the evidence, the Court focused on the fact that, although the city claimed that it offered extensive training to its officers, none of the officers were able to give specific responses as to the content of their training.  Id. at 1046.  Also, the Court relied on an expert opinion and the results of a city investigation that both found the city's training was inadequate.  Id. at 1046-47.

In the present case, the Court finds as a matter of law that Logan County adequately trained its prison staff.  Defendants have offered extensive evidence regarding how the County trains its employees.  Lieutenant Brown testified by affidavit about these various types of training.  For example, all officers must complete basic first aid and adult CPR training to work in the Logan County Jail.  (Ex. A, ¶ 14, Def. Mot. S.J.).  Officers also receive training on ways to address various medical problems, such as what to do when an inmate requires medical attention and medical personnel are not available.  (Ex. A, ¶ 19, Def. Mot. S.J.).  Also, correction officers are taught to refer an inmate to medical staff when they see any of the following symptoms: anxiousness, shaking, profuse sweating, difficulties in standing, problems with bodily control, hallucinations, and inability to converse coherently.  If any of these symptoms exist, correction officers are trained to refer the matter to the nurse.

Furthermore, officers are trained to look for any problems while conducting watch tours.  As explained previously, correction officers and the Jail Administrator conduct these watch tours to ensure inmate safety and security.  During the tours, officers are trained to look for shaking, tremors, hallucinations, and heartbeat-related complaints.  Finally, officers are specifically trained to detect signs of alcohol withdrawal.  New officers are instructed to look for signs of bowel control problems, inability to maintain balance, lack of coherence, or any hallucinations.

20

(Galyk Dep. at 30).  Officers also look for signs of shaking or sweating.  (Galyk Dep. at 17).

In conclusion, the County's training of correction officers is more than constitutionally adequate and falls short of deliberate indifference.  Accordingly, defendants' motion is granted on this claim.

## B.  State Claims

Plaintiffs assert state law claims for negligence, malpractice, and wrongful death against all defendants.  Defendants aver that political subdivisions and their employees are immune to state claims under Ohio Rev. Code section 2744.02(A).

Plaintiffs challenge the constitutionality of section 2744.02 under the Ohio Constitution. In support of this proposition, plaintiffs cite Kammeyer v. City of Sharonville, 311 F. Supp.2d 653 (S.D. Ohio 2003), and Owensby v. City of Cincinnati, 385 F. Supp.2d 626 (S.D. Ohio May 20, 2004).  It is true that both of these decisions call into doubt the constitutionality of the immunity statute.  However, more recently in Armstrong v. U.S. Bank, 2005 WL 1705023 (S.D. Ohio July 20, 2005), another judge in this district declined to follow Kammeyer.  Instead, the Court opted to follow the Ohio decisions that continue to apply section 2744.02.  In light of a clear split of authority within this district, as well as at the state level, and without a binding Circuit or Supreme Court Decision, the Court will follow the recent Armstrong decision applying the immunity statute.

Revised Code section 2744.02(A)(1) provides: "Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary

function."  Section 27744.02(B) expressly provides the following five situations where a political subdivision can be liable: damage caused by the negligent operation of a motor vehicle [(B)(1)]; damage caused by negligent acts of a political subdivision's employees with respect to its proprietary functions [(B)(2)]; damage cause by failure to keep roads in repair or from failure to remove obstructions from public roads [(B)(3)]; damage or injury caused on the grounds of buildings used in connection with the performance of a governmental function, but not including jails [(B)(4)]; and where civil liability is expressly imposed upon a political subdivision by the Revised Code [(B)(5)].

The second exception listed above deals with negligence in the performance of proprietary functions.  By definition, a proprietary function "involves activities that are customarily engaged in by nongovernmental persons."  R.C. 2244.01(G)(1)(b).  Also, the statute expressly states that proprietary functions are not those activities specified in R.C. 2244.01(C)(2), which lists governmental functions.  Clearly, none of the defendants in the present case were involved in proprietary functions as defined by statute.

The Court finds none of the five exceptions to political subdivision immunity apply to the present case.  Accordingly, the state law claims against defendant Logan County as a political subdivision are barred by statute and the County is entitled to summary judgment.

Relatedly, an employee of a political subdivision is immune from civil liability unless the "employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner."  R.C. 2744.03(A)(6)(b).  "[An] actor's conduct is in reckless disregard of the safety of others if ... such risk is substantially greater than that which is necessary to make his conduct negligent."  Ewolski v. City of Brunswick, 287 F.3d 492, 517 (6th Cir. 2002) (citing

Fabrey v. McDonald Village Police Dep't, 639 N.E.2d 31, 35 (Ohio 1994)).

Considering the facts of the case, the Court finds none of the individual prison employees were malicious, wanton, reckless, or in bad faith. The only two individual defendants who could arguably have behaved recklessly are Officers Wirick and Boone.[7] The Court explained previously how plaintiffs provided sufficient evidence to establish deliberate indifference on the part of these two officers. However, when considering the fact that the officers faced a serious dilemma in whether or not to move Susan Samples, being especially concerned with her possible head or neck injury, coupled with the measures they did take to ensure Susan's well being, the Court finds neither of the two officers' behavior was wanton or reckless as a matter of law. At most, considering all of the surrounding circumstances, the officers were merely negligent.

Accordingly, the state law claims against the individual defendants are barred by statute and the defendants are entitled to summary judgment on these claims.

## C. Motion for Reconsideration

Finally, plaintiffs have filed a motion (Doc. 57) asking the Court to reconsider the magistrate's May 16, 2005 order granting defendants' motion for a protective order.[8] The protective order prevents plaintiffs from adding an additional expert witness until after the summary judgment stage.

After reviewing the party's memoranda and the magistrate's protective order, the Court

---

[7] Plaintiffs devote a portion of their brief to explain why Dr. Costin's behavior rose to the level of recklessness with regards to overseeing the inmate health assessment policy. However, Dr. Costin testified that he believed the prison's policy was adequate and worked well before Ms. Samples' death. (Costin Dep. at 28). At most, Dr. Costin's behavior could only rise to the level of negligence. For statutory immunity purposes, that is not enough.

[8] The Court grants defendants' motion (Doc. 58) for leave to file a memorandum in opposition to plaintiff's motion for reconsideration.

agrees with the magistrate's ruling.  Plaintiffs' motion for reconsideration is denied.

### III.  DISPOSITION

For all of the foregoing reasons, the Court GRANTS in part and DENIES in part defendants' motion for summary judgment and DENIES plaintiffs' motion for reconsideration. Plaintiffs' section 1983 claim against Logan County remains pending.  All other claims are dismissed with prejudice.

The Clerk shall remove Docs. 45, 47, 49, 57, & 58 from the Court's pending motions list.

**IT IS SO ORDERED.**

/s/ George C. Smith
**GEORGE C. SMITH, JUDGE**
United States District Court

24